## OLIVER W. FARR *v.* HIRAM PUTNAM AND OTHERS.

### [IN CHANCERY.]

*Lien of Guardian on Ward's Estate. Administrator. Homestead. Husband and Wife.*

1. On the death of an insane ward, his administrator took possession of his estate with the consent of the guardian. The whole conduct of the guardian showed that he did not intend to retain a lien on the *corpus* of the property for what was due him, until after the sale of the property, when it appeared that the estate was insolvent; but he expected to be first paid out of the avails of what was sold; *Held*, (*a*) That, if the guardian ever had an equitable lien he had lost it; (*b*) That he had no lien on the homestead; for that also went into the possession of the administrator, with the guardian's consent.

2. On a bill brought in such case to procure a foreclosure of the lien, the court declined to decide whether the guardian had a superior right to the avails of the property after its sale; or whether, on a bill properly drawn, he had such right.

BILL to foreclose an equitable lien. Heard on the pleadings and the report of a special master, February Term, Orleans County, VEAZEY, Chancellor. Decree that the bill be dismissed. Affirmed.

The defendants were Hiram Putnam, Sarah B. Farr, J. P. Lamson, and Mrs. J. P. Lamson.

On January 9, 1877, the orator, being a son of Hyrcanus Farr, was appointed his guardian by the Probate Court, and he remained such until the death of said Hyrcanus, August 17,

1878.  Soon after the decease of said Farr, the defendant Putnam was appointed administrator of his estate; and on October 29, 1878, commissioners to adjust claims against the estate were appointed.  In 1840 the defendant, Sarah B. Farr, was married to one Ruscoe; and they lived together as husband and wife for about four years, when he deserted her and went to parts unknown.  In 1852 a marriage ceremony was performed between the said Hyrcanus and said Sarah B., she believing that said Ruscoe was dead.  And the said Hyrcanus and Sarah B. lived together as husband and wife until his death, both thinking that she was his lawful wife; and what property he left at his death was acquired by the united exertions of both. But the said Sarah B. was mistaken and said Ruscoe was alive and resided in Canada.  The said Hyrcanus had no children by the said Sarah B., but had a large family of children by a former marriage.  After their marriage, said Hyrcanus and Sarah B. lived in Woodbury for about five years, and then they moved to Cabot, having purchased a farm situated in Cabot and Woodbury, and lived on this farm till September 7, 1876.  On that day they left said home for the purpose of visiting his children in Stannard and Craftsbury.  When they left they intended to be absent only two weeks, and their sole object was to visit their friends.  For some two years prior to this time, the said Hyrcanus had been occasionally afflicted with epileptic fits, and was physically and mentally somewhat impaired. Within an hour after reaching the home of the orator, in Craftsbury, said Hyrcanus had a severe fit, and was also stricken with paralysis.  For a day or two he was unconscious, and remained helpless until his death.

After the paralytic shock, he occasionally had fits, and would be out of his head for a while, and then recover his consciousness, but was mentally and physically quite weak.  The said Hyrcanus was not in a condition to be removed to his home in Cabot, and so remained with his son, the said Oliver W. Farr,

until his decease. During the last six months of his life he was without his reason. The said Sarah B. remained at the orator's house during the sickness of said Hyrcanus, and went to Cabot at the time of his burial, and remaining there some weeks, she returned to Craftsbury. After a short time she went back to Cabot, and worked out at different places until the homestead was set out to her from the old farm, on the 20th day of November, 1880. The farm was rented to one Yaw while the said Hyrcanus was sick in Craftsbury; but the master found that, if he had been "able to return to his old home, he and the said Sarah B. would have so returned."

" I do not think that, at the time of said agreement to lease to Yaw, Hyrcanus had decided to permanently abandon his old homestead, as and for a homestead, but he was at that time satisfied he would not for the term of the lease be able to return; and that he then had reason to believe, and did believe, there were grave doubts as to his ever being able to return to Cabot."

The first meeting of the commissioners was at the orator's house, January 7, 1879. The defendants, Putnam and J. P. Lamson, Esq., an attorney, representing certain creditors, were present. The orator and said Putnam and Lamson finally agreed that the orator should be allowed $750 for " keeping ward and wife, and services of self and family, caring for same two years." The next day the orator settled his guardianship account with the Probate Court, and said account was allowed at $750. Immediately after the orator was appointed guardian, January 9, 1877, he took possession of the ward's property and had control and management of it until the ward's decease. The master found as to surrendering of possession of the property to the administrator by the guardian as follows:

" It is claimed by the defendants that it was agreed at that time that the amount allowed orator by the Probate Court, on the basis of an allowance of $750 for board and care as before

stated, should be treated as a common debt, and that he should share with the other creditors in the estate. Still, the defendant Putnam admitted upon the stand that he always supposed the orator was to be paid the amount due him as guardian after payment of charges for settlement of estate and amount allowed the widow, and before other creditors were paid. I am unable to find that said Oliver ever understandingly agreed to stand in common with the other creditors so far as his guardian account was concerned, but I do find that he always supposed and expected his guardian account would be paid first, and in preference to other claims.

* * * " At the time of the settlement of said guardian's account, it was ascertained that there was considerable personal property on-hand, the property of said estate, in the possession of said orator. And the farm at Cabot and Woodbury was still unsold and a part of said estate.

" After the expiration of Yaw's term, under his lease of the Cabot farm, the orator, as guardian, leased it to one Henry Wheeler, to carry on at the halves, who was in possession of said farm at the time of the death of said Hyrcanus. Some little time after the decease of said Hyrcanus, appraisers were appointed on his estate. Certain of the personal property of said estate was at the orator's in Craftsbury, and the balance at the old homestead in Cabot. The orator was with the appraisers at Craftsbury when they were in the discharge of their duty, and pointed out the property there belonging to said estate, and was also with them when they appraised the personal property and farm at Cabot.

" Said Wheeler was on the Cabot and Woodbury farm at the time the appraisers were there to appraise the property. Wheeler remained on said farm through the winter following the death of the old gentleman, under an arrangement made with the administrator, Putnam, to stay and feed out the hay, and take care of the stock; and in the spring of 1879 said administrator rented said farm to Jacob Farr, one of or-

ator's brothers, and said Jacob Farr paid for the rent of said farm to said administrator. The orator knew this, and made no objection thereto.

"The administrator took possession of the personal and real estate of the intestate, and this was done with the consent of the orator. But I find that the orator, at the time the administrator took such possession, understood and expected that said administrator was going to sell said property, and from the avails thereof he was first to be paid in full the amount allowed him in the settlement of his guardian account. The administrator supposed and expected that would be the result; but he did not feel authorized in paying said allowance till so directed by the Probate Court, and he never made any effort for such an order by said court."

In the fall of 1880, Sarah B. petitioned the Probate Court for the appointment of commissioners to set out a homestead and dower from the premises belonging to said Hyrcanus at the time of his decease.

The commissioners, on the 20th day of November, 1880, set out a homestead to Sarah B. Farr from said premises, and returned their report and warrant into the Probate Court on the 27th day of December, 1880, and the report was accepted and ordered recorded.

The orator had no knowledge of such proceedings until after the report of the commissioners had been returned to the Probate Court and accepted by it; but he did learn of the proceedings in time to take an appeal from the decree and order of the court. The appeal was allowed and duly entered in the County Court for Orleans County, at the February Term, 1881, and continued to the September Term, 1881. At this term, defendant Putnam was dismissed as an improper party, and it was ordered and adjudged by the court that the decree of the Probate

Court be affirmed ; and the cause was ordered to be certified back to the Probate Court. The master found :

'' The orator offered testimony tending to show that there was no trial in said cause, that no issue was formed therein, but that said judgment was rendered by the court without any trial.

" The defendants objected to the admission of such testimony for the reason that the orator is bound by the record ; and that such testimony is immaterial and incompetent, and an attempt to collaterally impeach a judgment of a court of competent jurisdiction, and does not tend to establish any issue made by any of the pleadings.

"I deemed it best to and did admit the testimony subject to the objection and exceptions by defendants. I find from the testimony thus admitted that, at said last-named term of Orleans County Court, the orator in this suit, being the plaintiff in that cause, filed an affidavit for a continuance of said cause to the next term of said court ; and there was a hearing upon that question, and the court refused to continue the case. The said Farr's counsel announced that he could not try the case, and the court thereupon rendered judgment as hereinbefore stated.

"The judgment so rendered and ordered to be certified to the Probate Court was so certified, and the certificate thereof was filed in the Probate Court on the 21st day of December, 1881."

The warrant issued to the commissioners commenced :

'' Whereas Hyrcanus Farr, late of Craftsbury, in said district, deceased, inestate, died seized and possessed of the following described real estate, to wit : It being the home farm where the said Hyrcanus Farr last resided in said Cabot, containing about 160 acres of land, said land being situated in the towns of Cabot and Woodbury, in said county, and out of which Sarah Farr, the widow of said deceased, is entitled to a homestead, and said widow is also entitled to dower ; therefore by the authority of the state of Vermont, you are hereby appointed commis-

sioners, and authorized to appraise all the real estate whereof said deceased died seized. *  *  * When you have completed your inventory, you will then proceed to set out from the dwelling-house, out-buildings, and lands used in connection therewith, and used and kept by said Hyrcanus Farr at the time of his decease, as a homestead, to said Sarah Farr," etc.

As to the administrator's account it was found that it came under the consideration of the Probate Court after due notice, on the 13th day of July, 1881; that although no one appeared to object, at the request of the orator, it was continued to October 26, 1881, and was again continued till December 27, 1881, when said account was examined, sworn to, allowed and ordered recorded, and is as follows :

"Hiram Putnam, administrator of the estate of Hyrcanus Farr, late of Craftsbury, deceased, in account with said estate.

To the estate,      Cr.

To amt. of real estate and personal property as per appraisal,.............$2,538 53
To cash received for property not appraised,..................................13 50
To income from real estate,....................................................113 10

$2,665 13

To the same estate,      Dr.

By homestead set to widow out of real estate,...........................$  500 00
By shrinkage on appraisal, as per Schedule A,............................1,212 97
By household goods assigned to widow,.....................................129 12

*  *  * Then this account was examined and sworn to, the question of its allowance being continued, awaiting the result of a matter pending in Orleans County Court.

Attest, O. H. AUSTIN, Judge."

After the homestead was set out to the said Sarah B. Farr, the administrator, having obtained license to sell the real estate of his intestate, advertised for sale, and sold, at public auction, all the residue of the real estate of which the intstate died seized, to the said Sarah B. Farr, for the sum of $400, she being the highest bidder for the same.

And, in accordance with said sale, said Putnam, as such ad-

ministrator, under his license aforesaid, executed a deed of the same to the said Sarah B., and she paid him therefor.

And all the personal property belonging to the estate of the said Hyrcanus, which had not previously been disposed of, was sold at time of said auction.    The orator knew that the administrator, Putnam, had applied for, and obtained, a license to sell all the real estate of which the said Hyrcanus Farr died seized, a long time previous to the time said homestead was set out; but he, at all times, claimed he must be paid in full the amount of his guardian account from the avails of the property of which the said Hyrcanus died seized.

At the time the defendant Sarah B. bid off the balance of the said premises for $400, she was in need of funds with which to pay for the same, and she applied to the defendant Abbie A. Lamson for a loan of said money.    Mrs. Lamson had money which she held in her own right and passed over to her husband, J. P. Lamson, a check for the money required by the said Sarah B., and he obtained the currency therefor.    At the time the administrator deeded said real estate, so sold at auction, to the said Sarah B., the said J. P. Lamson, acting for and on behalf of his wife, passed over to the said Sarah the sum of $430.    And Mrs. Farr therefore, on the 20th day of April, 1881, executed and delivered a mortgage of said premises, including the homestead, to Mrs. Lamson, to secure the payment of said sum of money, as specified in two promissory notes then executed and delivered to said J. P. Lamson for his said wife.

The prayer of the bill was that defendants be foreclosed from all right in the said estate unless they paid the said $750.

*L. H. Thompson*, for the orator.

The orator having been appointed guardian of Hyrcanus Farr under the provisions of Rev. Laws, ss. 2436 and 2438, until legally discharged from that appointment, had the possession and management of the estate of his ward, the care and custody of his person, and the care and custody of such mem-

bers of his family as were dependent upon said ward for support. Rev. Laws, s. 2445 ; *Waterman* v. *Wright*, 36 Vt. 165.

By his appointment as guardian, the orator became a trustee, and thereby assumed the liabilities, and acquired the legal and equitable rights, of a trustee as to his ward's estate. Rev. Laws, ss. 2447, 2285 ; 3 Pom. Eq. Jur. ss. 1088, 1097.

As trustee or·guardian, the orator had an equitable lien upon his ward's estate, which took precedence of all other claims against the estate, and all persons taking said property with knowledge of said orator having been guardian, took the same subject to his lien. See Perry, Tr. (1st ed.) ss. 907, 910 ; Schoul. Dom. Rel. pp. 464, 465 ; 2 Pom. Eq. Jur. s. 1085 ; *Rensselaer & S. R. Co.* v. *Miller*, 47 Vt. 152 ; *Field* v. *Wilbur*, 49 Vt. 165.

The defendant Abbie A. Lamson had constructive notice of orator's rights by virtue of proceedings in Probate Court. Again, she cannot stand as an innocent purchaser for value without notice, as she had actual notice ; as her agent, attorney, and husband, J. P. Lamson, who acted for her, had full knowledge at the time of taking her mortgage of the equitable lien of the orator on said real estate. Story, Ag. ss. 140, 140 *a* ; *Hart* v. *Farmers & M. Bank*, 33 Vt. 253.

A widow takes a homestead by operation of the law, which says that on the death of a housekeeper or head of a family leaving a widow or minor children, " his homestead *shall pass to and vest* in such widow and children." Rev. Laws, ss. 1898, 1899.

The widow takes the homestead by virtue of her relation as wife to the deceased, the same as she does dower which does not depend on the contingency of dower being set out. *Dummerston* v. *Newfane*, 37 Vt. 13 ; *Johnson* v. *Johnson*, 41 Vt. 467 ; *Grant* v. *Parham*, 15 Vt. 649.

· The setting out of a homestead is a proceeding to sever and partition, and not to give title. If no title or homestead ex-

ists, the proceeding goes for nothing. Rev. Laws, s. 1970; *Grice* v. *Randall*, 23 Vt. 243; Freem. Judg. s. 304.

The orator is not estopped by the judgment in the homestead proceedings. Freem. Judg. s. 276, 281, 303.

The orator lost none of his rights by permitting the defendant Putnam to take possession of the property. The power of the orator to dispose of the property by sale or otherwise was terminated by the death of his ward. The Probate Court could give him no power to sell the same and satisfy his claim. He stood as a mortgagee of the property, and if the administrator did not pay him he must bring his suit in equity to enforce his lien. Of course it would have been different if the estate of said ward at his death had been in money instead of chattels and real estate. It seems that the administrator without the consent of the orator had a right to take possession of said property and hold the same subject to the orator's lien.

He stands as a mortgagee of the property he is pursuing. The right under a mortgage is not affected by the setting out of a homestead. *Goodall* v. *Boardman*, 53 Vt. 92.

But Hyrcanus Farr was not legally married, and at his decease was not a housekeeper or head of a family, and hence left no homestead. R. L. s. 1894; *Bugbee* v. *Bemis*, 50 Vt. 219.

The Court of Chancery has jurisdiction. 3 Pom. Eq. Jur. ss. 1088, 1097; 1 Pom. Eq. Jur. s. 100; *Harris* v. *Harris*, 44 Vt. 320; *Field* v. *Torrey*, 7 Vt. 372.

*J. P. Lamson* and *Bates & May*, for the defendants.

If the orator had any equitable lien at the time his father died, he lost it by voluntary delivery of property to Mr. Putnam, as administrator, to be administered as assets of the estate. *Richardson* v. *Merrill*, 32 Vt. 27.

The orator is estopped from asserting his present claim. *Stone* v. *Fairbanks*, 53 Vt. 145.

Farr *v.* Putnam.

The guardianship ceased on the death of the ward, and it was the duty of the orator then " to pay over and deliver the estate and effects remaining in his hands　＊　＊　＊　to persons entitled to same," namely, the administrator.　3 Redf. Willis, p. 457, s. 56; Rev. Laws, ss. 2447, 2488.

The Probate Court has jurisdiction of the appointment, power, duties, and rights of guardians and wards, and settlement of estates.　Rev. Laws, s. 2018; *Lathrop* v. *Hitchcock*, 38 Vt. 49; *Boyden* v. *Ward*, 38 Vt. 628; 22 Vt. 50.

The decree of the Probate Court, affirmed by the County Court, as to the homestead of Mrs. Farr, concludes the orator, both in law and equity.　*Atwood* v. *Robbins*, 35 Vt. 530; 32 Vt. 472; 18 Vt. 77; 11 Vt. 148; 34 Vt. 365; *Leach* v. *Leach*, 51 Vt. 440; 3 Vt. 400; 16 Vt. 313; *Grice* v. *Randall*, 23 Vt. 239; *Stone* v. *Peasley*, 28 Vt. 716; *Lenehan* v. *Spaulding*, 57 Vt. 115; *Caujolle* v. *Curtis*, 80 U. S. 13 Wall. 465 (20 L. ed. 507); *Roderigas* v. *East River Sav. Inst.* 63 N. Y. 460; *S. C.* 20 Am. Rep. 555; *Gates* v. *Treat*, 17 Conn. 392; Freem. Judg. 256, 272, 313; Thomp. Homesteads, s. 614; 38 Tex. 491; 6 Cal. 234; 2 Bish. Marr & D. 765; 34 La. 805; 48 Mo. 560; 17 Ind. 183; Freem. Judg. s. 319*a*.

The guardian had no right to sell the real estate.　Rev. Laws s. 2477.

If he had such license the wife must join.　Rev. Laws, s. 1910.

The real estate of Hyrcanus was never charged to the guardian and was never under his control.　*Munroe* v. *Holmes*, 9 Allen, 244; 13 Allen 109.

There is no such equitable lien, as claimed by orator in this case.　1 Story, Eq. Jur. s. 506, *et seq;* 2 Story, Eq. s. 1216; Schoul. Exrs. s. 264.

But if the unpaid balance is to be treated as a lien upon the property, it should not be paid before the reasonable, necessary expenses of administration are satisfied. 2 Story Eq. Jur. s. 1246.

The case of *Pingree* v. *Goodrich*, 41 Vt. 47, seems to be a full and complete answer to orator's claim.

In order to render the orders and decrees of the Probate Court void, it must appear upon the face of the record that the court has proceeded in a manner prohibited or not authorized by law. *Probate Court* v. *Winch*, 57 Vt. 282. See *Byram* v. *Byram*, 27 Vt. 295; *True* v. *Morrill*, 28 Vt. 672.

The orator can reach this balance in the hands of the administrator by applying to the Probate Court, and, if dissatisfied, by appeal. *Davis* v. *Gaines*, 104 U. S. 386 (26 L. ed. 757); Rorer, Jud. Sales, s. 470.

The decree of the Probate Court allowing $172.12 to Mrs. Farr was final. *Richardson* v. *Merrill*, 32 Vt. 27; *Leach* v. *Leach*, 51 Vt. 440; 3 Vt. 400, 16 Vt. 313. See *Probate Court* v. *Van Duzer*, 13 Vt. 135.

The opinion of the court was delivered by

ROWELL, J. Before and at the time of the death of Hyrcanus Farr, an insane person, on August 17, 1878, the orator was his guardian.

By his bill the orator seeks to subject his ward's estate in the hands of the administrator and of the other defendants as far as they have had to do with it, to a first charge or lien for the payment of the balance found due him on settlement of his guardianship account in the Probate Court on January 8, 1879. The bill goes upon the ground that in the orator's hands his ward's property was chargeable with the payment of what was due him as guardian; but that the property was unlawfully and against his will taken from his possession by the administrator,

and therefore is still chargeable in his favor by way of an equitable lien or mortgage, for the foreclosure of which he prays.

But the findings of the master do not sustain the allegation that the property was taken from the orator unlawfully and against his will. On the contrary it appears that the administrator took it with his consent, though with an understanding and expectation on his part that it would be sold and he paid from the proceeds. And the administrator expected the result would be that he would be thus paid, but he did not feel authorized to make payment without an order of the Probate Court, which he has never attempted to obtain.

It also appears that the orator was with the appraisers when they appraised the property of the estate, and pointed out some of it to them ; that before the property was sold he knew the administrator had obtained license to sell the real estate ; and that at one time he bargained with the administrator to buy the whole estate for $1350, but the trade fell through. During all this time it does not appear that the orator claimed any lien on the property, but only, when he said anything about it, that he should be first paid out of the proceeds.

The orator concedes that if he never had a lien on the property, or if he had one and has lost it, he cannot maintain his bill. Now, without undertaking to say whether he ever had a lien or not, we think if he ever had one he has waived and lost it. See what he has done. Every thing shows that he did not intend to retain a lien on the corpus of the property itself in the hands of the administrator ; for he consented to let it go into his hands, supposing and expecting he would sell it in due course of administration. And his consent was not, as claimed, on condition that he should be paid from the proceeds, but was unconditional and absolute. How then can it be said that he intended to retain a lien on the property? It is clear that he did not so intend, not even as to the home-

Farr *v.* Putnam.

stead, for that went into the hands of the administrator with his consent with the rest of the estate and with the same expectation on his part that he was going to be paid out of the avails of the property sold, and at that time the estate appeared to be ample, aside from the homestead, to pay him, if he was to be preferred to other creditors, and that was what he expected, and he then neither claimed nor expected anything else; but now, the estate having been all sold, except the homestead, and converted into money, it transpires that by reason of the depreciation of the property in value from the appraisal there is very little left of the avails with which to pay any body. This makes the idea of setting up a lien on the property look very much like an after-thought on the part of the orator, conceived when in the course of events a necessity for it seemed to arise.

We have not inquired whether the orator has a superior right to be paid out of the avails of the property; for if he has he cannot assert it under his bill as drawn, certainly, if he could by a bill properly drawn and against proper parties.

This renders it unnecessary to consider the other points made in argument.

*Decree affirmed and cause remanded.*